**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | : | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| JAYME EBNER<br><br>Plaintiff,<br><br>vs.<br><br>NOVO NORDISK INC., AND NOVO NORDISK A/S<br><br>Defendants. | : | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO. 2:26-cv-06639 |

**COMPLAINT AND JURY DEMAND**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Washington as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Spokane, Washington (City/State).

X Plaintiff purchased and used Defendant(s)' products in Spokane, Washington

(City/State).

__ The Original Venue is a judicial district in which Defendant __________ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): Defendants routinely market their product at issue in this District and conduct business in this District related to their product at issue in the State of Washington. Venue is further proper as Plaintiff is a resident of Washington, was prescribed all Defendant's product in the state of Washington, and it where her injury and subsequent treatment has occurred.

X There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendants Novo Nordisk Inc., and Novo Nordisk A/S is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): ____________________________________________

COMES NOW, Plaintiff, Jayme Ebner, by and through the undersigned counsel, and brings their complaint against Defendant Novo Nordisk Inc. for damages suffered by Jayme Ebner who was severely injured as a result of Defendant's widespread marketing of their drugs, Victoza, and her subsequent use of Victoza, and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. At all relevant times hereto, Plaintiff Jayme Ebner was a resident and citizen of the state of Washington.

2. Plaintiff was prescribed Victoza and took the medications as directed by her physicians. As a result of her use of Victoza, she developed non-arteritic anterior ischemic optic

neuropathy (NAION) in her right eye and suffers severe physical and emotional injuries and radical changes to her lifestyle given her severe loss of sight.

3. Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

4. Defendant Novo Nordisk Inc. is wholly owned by Novo Nordisk US Commercial Holdings, Inc.

5. Upon information and belief, Defendant failed to warn physicians and the end users of Victoza of the complications and devastating effects of which the company knew or should have known, including NAION, which can result in blindness and permanent vision loss.

6. Upon information and belief, Defendant's marketing was deceptive and misleading about the true risks associated with use of Victoza of which the company knew or should have known.

## BACKGROUND

### I. The Development and Approval of Victoza

7. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[1]

8. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Apr. 30, 2026).
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Apr. 30, 2026).

and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

9. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

10. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

11. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

12. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

13. Novo Nordisk received marketing authorization for Victoza on June 30, 2009, and Victoza was subsequently launched in the UK, Germany, Denmark, Norway, and Ireland.[8]

14. In Japan, Novo Nordisk received marketing authorization for Victoza on January 20, 2010.[9]

---

[3] *Id.*
[4] *Id.*
[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Apr. 30, 2026).
[6] *Id.*
[7] *Id.*
[8] https://www.novonordisk.com/content/nncorp/global/en/news-and-media/news-and-ir-materials/news-details.html?id=3213 (last visited Apr. 30, 2026).
[9] https://www.fiercebiotech.com/biotech/novo-nordisk-receives-us-approval-for-victoza%C3%A2%C2%AE-liraglutide-for-treatment-of-type-2 (last visited Apr. 30, 2026).

15. In January 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[10] at which point Novo Nordisk moved forward with studying the drug for weight loss.[11]

16. On April 9, 2012, Novo Nordisk received approval from the FDA to update the product label for Victoza to include data showing superior blood sugar control when compared to Januvia.[12]

17. In August 2017, the FDA approved a new indication for Victoza to reduce the risk of major adverse cardiovascular (CV) events, heart attack, stroke, and CV death, in adults with type 2 diabetes and established CV disease.[13]

18. On June 17, 2019, the FDA approved Victoza for treatment of pediatric patients 10 years or older with typ2 2 diabetes.[14]

19. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[15]

---

[10] Jackson, S. H., Martin, T. S., Jones, J. D., Seal, D., & Emanuel, F. (2010). Liraglutide (victoza): the first once-daily incretin mimetic injection for type-2 diabetes. *P & T: a peer-reviewed journal for formulary management*, 35(9), 498–529. https://pmc.ncbi.nlm.nih.gov/articles/PMC2957743/ (last visited Apr. 30, 2026).
[11] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Apr. 30, 2026).
[12] https://www.drugs.com/newdrugs/victoza-label-updated-include-data-showing-superior-efficacy-compared-januvia-3168.html (last visited Apr. 30, 2026).
[13] https://www.drugs.com/newdrugs/victoza-liraglutide-approved-reduce-risk-three-major-adverse-cardiovascular-events-type-2-diabetes-4582.html (last visited Apr. 30, 2026).
[14] https://www.drugs.com/newdrugs/fda-approves-victoza-liraglutide-pediatric-patients-10-years-older-type-2-diabetes-4994.html (last visited Apr. 30, 2026).
[15] *Id*.

20. Defendant continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

21. In addition to the results, the published study, which was funded by Defendant, argued: "Obesity is a chronic disease and global public health challenge."[16]

22. However, NAION and permanent vision loss were not identified as risks.

23. A whistleblower lawsuit filed by Phillips & Cohen LLP in 2010 against Novo Nordisk alleging illegal marketing, promotion, and sale of its best-selling diabetes drug, Victoza, was resolved as part of the pharmaceutical company's $58.65 million settlement with the federal government for alleged healthcare fraud and Federal Food, Drug, and Cosmetic Act violations.[17] When additional state-level whistleblower settlements are included, the total Novo Nordisk paid came to $60 million, including $48 million to settle allegations of illegal marketing, promotion, and sale of Victoza from 2010 to 2014 in violation of the False Claims Act.[18]

24. In this case, the DOJ investigated the allegations, chose to intervene, and ultimately reached the settlement with Novo Nordisk. The DOJ asserted that the company had misbranded its popular Type II diabetes drug, Victoza, by failing to comply with an FDA-mandated Risk Evaluation and Mitigation Strategy (REMS).[19] The DOJ alleged that the company's sales reps

[16] *Id.*
[17] https://www.prnewswire.com/news-releases/insurance-whistleblower-recoveries-from-phillips--cohen-cases-bring-novo-nordisks-victoza-settlement-to-60-million-300514235.html (last visited Apr. 30, 2026); https://www.phillipsandcohen.com/novo-nordisk-whistleblower-settlement-victoza/ (last visited Apr. 30, 2026).
[18] https://www.prnewswire.com/news-releases/insurance-whistleblower-recoveries-from-phillips--cohen-cases-bring-novo-nordisks-victoza-settlement-to-60-million-300514235.html (last visited Apr. 30, 2026); https://www.phillipsandcohen.com/novo-nordisk-whistleblower-settlement-victoza/ (last visited Apr. 30, 2026).
[19] https://www.legalreader.com/novo-nordisk-settled-victoza/ (last visited Apr. 30, 2026).

provided doctors with information that led to the false or misleading impression that the Victoza warning about MTC was either incorrect or unimportant.[20] According to the FDA, a 2011 survey revealed that roughly 50% of primary doctors had no idea of Victoza's risk of MTC. Even after the agency changed procedures in an effort to increase awareness, Novo Nordisk reps allegedly ignored the new procedures.[21] One of the company's former sales managers — a nurse — said that Novo Nordisk routinely sent sales reps pretending to be diabetes educators out to doctors' offices, where they would then illegally promote Victoza.[22]

25. As most companies that agree to settlements do, Novo Nordisk issued a statement claiming it had done nothing wrong. The head of North American operations, Doug Langa, said: "While we do not agree with the U.S. government's legal conclusions and deny any wrongdoing, we're pleased to have negotiated a resolution that allows the company to return its full attention to developing medicines that help improve the lives of patients."[23]

## II. Defendant's Rampant Marketing and Promotion Created a Media Frenzy, Mega Seller, Thousands of Prescriptions, and Billions in Sales

26. Since Defendant discovered GLP-1 agonists potential use for weight loss, Defendant began working to change medical consensus as it relates to obesity.

27. Throughout their marketing, Defendant fails to disclose the true serious side effects of Victoza, such as permanent vision loss.

28. When the Defendant announced that they had started selling Victoza in the United States, they touted the medication as "more treatment options like Victoza that address critical

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

aspects of diabetes care beyond glucose lowering…”.[24] The Defendant offered an “Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years.”[25]

29. Novo Nordisk is not permitted to market Victoza for weight loss without FDA approval for that specific indication, but Novo Nordisk began mentioning weight loss as an added clinical benefit because in one study it provided greater weight loss than Merck’s Januvia.[26]

30. In 2017, Novo Nordisk paid $60 million dollars to resolve U.S. federal and state claims alleging: off-label promotion, False Claims Act violations, and misbranding of Victoza (2010-2014).[27] The Department of Justice alleged illegal encouragement of use of prediabetes, weight loss, and Type 1 diabetes.[28] Internal sales training allegedly encouraged off-label promotion for weight loss.[29]

31. By 2018, Novo Nordisk spent over $123 million annually on Victoza DTC television advertising in the United States.[30]

32. Between 2014-2017, Victoza was a primary growth driver for Novo Nordisk.[31]

---

[24] *See* Novo Nordisk, *Victoza (liraglutide) is approved in the US as the only type 2 diabetes treatment indicated to reduce the risk of three major adverse cardiovascular events.* (Aug. 25, 2017), https://www.prnewswire.com/news-releases/victoza-liraglutide-is-approved-in-the-us-as-the-only-type-2-diabetes-treatment-indicated-to-reduce-the-risk-of-three-major-adverse-cardiovascular-events-300509713.html (last visited Apr. 30, 2026).

[25] *Id.*

[26] https://www.mmm-online.com/home/channel/pharmaceutical/victoza/ (last visited Apr. 30, 2026).

[27] https://www.phillipsandcohen.com/novo-nordisk-whistleblower-settlement-victoza/ (last visited Apr. 30, 2026).

[28] *Id.*

[29] *Id.*

[30] https://www.fiercepharma.com/marketing/novo-shifts-victoza-ad-message-duo-tv-spots-highlighting-trifecta-heart-benefits (last visited Apr. 30, 2026).

[31] https://www.fiercepharma.com/pharma/novo-s-diabetes-med-victoza-keeps-growing-despite-lilly-s-market-share-creep (last visited Apr. 30, 2026).

33. Although Victoza's revenue peaked between 2014-2017, prior to semaglutide products, Victoza remained a top 10 Novo Nordisk product through 2024.[32]

34. Victoza's peak revenue occurred between 2019 to 2021 before the launch of Ozempic which created significant revenue erosion.[33] Strategically, Victoza funded Defendant's transition to semaglutide dominance with products like Ozempic and Wegovy and financed manufacturing scale-up.

35. Victoza boasted $1.26 billion in sales in 2023, making it Defendant's sixth best-selling drug.[34]

36. From January 2015 to July 2018, Novo Nordisk spent more than $325 million U.S. National Television advertising for Victoza.[35]

37. During the 2016 Rio Olympics alone — a 17-day event — the top spending pharma brand was Victoza at $9.2 million, outpacing major brands like Lyrica and Xeljanz.[36]

38. By 2018, Novo Nordisk deliberately shifted digital and social advertising focus away from Victoza toward Ozempic and Wegovy, with Victoza no longer actively promoted on

---

[32] https://www.pharmalive.com/company-of-the-year-2024-novo-nordisk-continuing-triumph/ (last visited Apr. 30, 2026).

[33] https://ml-eu.globenewswire.com/Resource/Download/3b026e01-512b-4966-b10c-c8d6649bea6a#:~:text=The%20development%20in%20sales%20reflects,while%20Biopharmaceuticals%20sales%20were%20unchanged.&text=Sales%20growth%20in%20the%20first%20six%20months%20of%202019%20of,of%203%25%20(CER).&text=1)%20Primarily%20oral%20antidiabetic%20products,Vagifem%C2%AE%20and%20Activelle%C2%AE.&text=Sales%20in%20Diabetes%20increased%20by,the%20independent%20data%20provider%20IQVIA. (last visited Apr. 30, 2026).

[34] *Id*.

[35] https://www.fiercepharma.com/marketing/novo-nordisk-ozempic-spends-big-tv-august-still-trailed-abbvie-and-pfizer-spenders (last visited April 30, 2026).

[36] https://www.fiercepharma.com/marketing/rio-olympics-end-big-tv-ad-spending-tallies-but-pharma-marketers-finish-middle-pack (last visited April 29, 2026).

consumer-facing social platforms.[37]

39. Novo Nordisk's expansion into TV advertising for Victoza was part of a broader corporate surge. In 2015, Novo Nordisk ranked as one of the top five fastest-growing advertisers in the entire U.S. market, with a 195% spending increase year-over-year to reach $261 million in total U.S. advertising — driven partly by competition for Victoza and the launch of Tresiba.[38]

40. The entire pharmaceutical industry spent between $2.1 billion and $2.2 billion annually paying doctors for speaking, consulting, meals, travel and gifts during the 2014–2018 period, according to ProPublica's analysis.[39] Novo Nordisk was among the leading spenders in the diabetes category.[40] Notably, Novo Nordisk and its subsidiaries attributed 90 payments totaling $133,000 to a product called "Disease State" — a phrase that is physician talk for a medical condition, not a particular drug — making it difficult to fully attribute payments to Victoza specifically.[41] This data-labeling practice was flagged by ProPublica as a way some companies obscured which drugs were being promoted.[42]

41. The DOJ settlement already established the context for what those physician payments were being used for during 2010–2014.[43] The government alleged that some Novo Nordisk sales representatives gave information to physicians that created the "false or misleading impression" that the Victoza REMS-required cancer risk message was erroneous, irrelevant, or

---

[37] *Id.*
[38] https://www.fiercepharma.com/marketing/novo-shifts-victoza-ad-message-duo-tv-spots-highlighting-trifecta-heart-benefits (last visited April 30, 2026).
[39] https://www.propublica.org/article/why-pharma-payments-to-doctors-were-so-hard-to-parse (last visited Apr. 30, 2026).
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] https://www.biopharmadive.com/news/novo-nordisk-settles-claims-related-to-victoza-marketing/504340/ (last visited Apr. 30, 2026).

unimportant, and that the company further obscured risk information through efforts from sales reps.[44]

42. Since 2014, Novo Nordisk has spent more than $30 million lobbying members of Congress and other federal officials, according to a KFF Health News review of lobbying disclosures. A consistent subject has been the Treat and Reduce Obesity Act.[45]

43. Novo Nordisk hired the lobbying firm Arnold & Porter, which recently hired a former lead sponsor of the Treat and Reduce Obesity Act, Rep. Ron Kind, as a senior strategic adviser.[46]

44. In 2023, Novo Nordisk and its U.S. subsidiary spent over $5 million on lobbying, hiring 77 lobbyists across 13 firms — a 51% increase from the number of lobbyists hired in 2022. Of those, 54 previously held government jobs.[47]

45. Novo Nordisk spent $5,800,000 on federal lobbying in 2024 alone.[48]

46. Novo Nordisk contributes more than $500,000 annually to the Obesity Action Coalition (OAC) and has been a corporate partner since 2013.[49]

47. The company has either directly hosted or been indirectly involved in policy events

---

[44] *Id.*
[45] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Apr. 30, 2026).
[46] https://thehill.com/business/4163068-novo-nordisk-boosts-lobbying-power-as-it-seeks-medicare-coverage-for-obesity-drugs/ (last visited Apr. 30, 2026).
[47] https://www.opensecrets.org/news/2024/07/ozempic-producer-novo-nordisk-on-track-for-record-spending-on-lobbying-in-2024/ (last visited Apr. 30, 2026).
[48] https://www.opensecrets.org/orgs/novo-nordisk/summary?id=D000028050 (last visited April 30, 2026).
[49] https://finance.yahoo.com/news/pharma-lobbying-for-weight-loss-drugs-could-soon-pay-off-160027372.html?guccounter=1&guce_referrer=aHR0cHM6Ly9jbGF1ZGUuYWkv&guce_referrer_sig=AQAAACA5hJAGLtBjoq096Oz5_KekxpnpKbw_y13cEoM8n4QS1YjpNeoJLGW661buc-eXiTJwLlu_X0MPf8Vtr1DThLFDl0E4KxhmEdRFdFzzgOxOM7YLHUOgi7DMtjuWvHEbwBKZ-ly22C6mCE_4cBbnyyekSGwDf7EeX5M_lRK8Hl8I (last visited Apr. 30, 2026).

throughout the country through advocates from organizations it sponsors, including the OAC. Yahoo Finance reviewed programs from at least two of these events — one in Philadelphia in 2021 and one in New Jersey in 2022 — where speakers included Novo Nordisk representatives or OAC members.[50]

48. Novo Nordisk has made extensive and well-documented contributions to physician and healthcare provider education on obesity — a strategy that simultaneously builds the clinical case for prescribing its own GLP-1 drugs.

49. In 2018, Novo Nordisk announced it will work with the Obesity Society and the Obesity Medicine Association to create the Obesity Medicine Fellowship Development Program, which will eventually bring the number of fellowship programs to 20 across the country.[51] The president of the Obesity Society called the creation of new fellowship programs "a giant leap forward for the field of obesity medicine."[52]

50. Novo Nordisk's Scientific Exchange website hosts continuing education activities developed by third parties via educational grants from Novo Nordisk, covering topics such as "Tackling the Cardiovascular Consequences of Obesity: Is It Time for a Paradigm Shift in Obesity Care?" and "Lifestyle Management and Pharmacologic Treatment Options for People with Diabetes and Chronic Kidney Disease."[53]

51. As far back as 2009, the American Diabetes Association and Novo Nordisk announced a $1.2 million research award to support researchers studying the effects of intestinal

---

[50] *Id.*
[51] https://www.ajmc.com/view/novo-nordisk-funds-obesity-fellows-program-to-address-gaps-in-physician-education (last visited Apr. 30, 2026).
[52] *Id.*
[53] https://www.novonordiskmedical.com/therapeutic-areas/obesity/forward.html (last visited April 30, 2026).

hormones — including GLP-1 — on obesity and pre-diabetes.[54] The two grants specifically funded investigation into preventing or treating obesity with GLP-1-based therapies.[55]

52. According to open payments data, Novo Nordisk spent $33,927,336.42 on marketing/consulting/travel/food and beverage/etc. to physicians in 2022 alone.[56]

53. Defendant also owns and operates several marketing campaign websites that are created for the purpose of educating on the science of obesity and creating a change in how obesity is understood and treated.

54. Ther includes the website "The Truth about Weight."[57]

55. Defendant has also spent significant resources aligning themselves and infiltrating their influence into physician and advocacy groups.

56. This includes the American Board of Obesity Medicine. The former Director of the American Board of Obesity Medicine who served from 2017 to November of 2021 received payments by Novo Nordisk during her time as director of the American Board of Obesity Medicine.[58]

57. Ther former director of the American Board of Obesity Medicine currently promotes their GLP-1 agonists for weight loss as part of their telehealth company and continues to receive payments.[59]

---

[54] https://www.biospace.com/american-diabetes-association-and-novo-nordisk-inc-announce-1-2-million-research-support (last visited Apr. 30, 2026).
[55] *Id.*
[56] *https*://openpaymentsdata.cms.gov/company/100000000144 (last visited Apr. 30, 2026).
[57] Truth About Weight, https://www.truthaboutweight.com/ (last visited Apr. 30, 2026).
[58]https://joinfound.com/pages/medication-biology (last visited Apr. 30, 2026); https://openpaymentsdata.cms.gov/physician/1294300 (last visited Apr. 30, 2026); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited Apr. 30, 2026).
[59]https://joinfound.com/pages/medication-biology (last visited Apr. 30, 2026);https://openpaymentsdata.cms.gov/physician/1294300 (last visited Apr. 30, 2026); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited Apr. 30, 2026).

58. At least one member of the American Board of Obesity Medicine that helped write the guidelines for obesity management has received payments directly from Novo Nordisk according to Open Payments Data during the same time he wrote those guidelines.[60]

59. Novo Nordisk contributes money directly to education courses used to satisfy continuing education requirements or to prepare for certification in obesity medicine.[61]

60. Novo Nordisk serves on the board and/or provides direct financial contributions to many public health advocacy groups.

61. Ther includes Obesity in Action Coalition, to which Novo Nordisk contributes more than $500,000 annually.[62] Novo Nordisk has been a partner since 2013, before any of its drugs were approved for weight loss.

62. Novo Nordisk also serves on the Corporate Council of American Society for Metabolic and Bariatric Society, another public health partner of the American Board of Obesity Medicine.[63]

63. Novo Nordisk is also a corporate member and directly financially contributes to Stop Obesity Alliance, yet another public health partner of the American Board of Obesity Medicine.[64]

64. Novo Nordisk is a member of additional advocacy organizations and lobbying groups separate and apart from these public health partners of the American Board of Obesity Medicine.

---

[60] https://openpaymentsdata.cms.gov/physician/1379381 (last visited Apr. 30, 2026); *see also* https://www.abom.org/karl-nadolsky/.
[61] *Id.*
[62] https://www.obesityaction.org/corporate-partners/ (last accessed Apr. 30, 2026).
[63] https://asmbs.org/corporate-council (last visited Apr. 30, 2026).
[64] https://stop.publichealth.gwu.edu/membership (last visited on Apr. 30, 2026).

65. Ther includes the Obesity Care Advocacy Network, which lobbies for legislation to expand access to Novo Nordisk's drugs.[65]

66. For example, Novo Nordisk's drugs were the subject of an investigative report on 60 Minutes that aired New Year's Day of 2023.[66]

67. Complaints have been filed alleging that the "news" piece was in reality "deceptive marketing" in which all physicians interviewed had received payments by Novo Nordisk. [67]

68. The FDA is currently investigating the marketing practices of Novo Nordisk.[68]

69. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

70. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [69]

71. In 2021, Novo Holdings participated in a $540 million round of financing with Noom.[70] At that time, Novo Holdings tweeted that it "is pleased to note that it has participated in the $540 million Series F round in @noom, a leading digital health platform…".[71]

72. Novo Holdings currently lists on its website that is has "venture investments" in

[65]https://assets.obesitycareadvocacynetwork.com/TROA_fact_sheet_11_12_21_48098432e0/TROA_fact_sheet_11_12_21_48098432e0.pdf (last visited on Apr. 30, 2026)

[66] https://www.cbsnews.com/news/wegozy-ozempic-explainer-60-minutes-2023-01-01/ (last visited Aug. 30, 2026).

[67] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Apr. 30, 2026).

[68] https://www.pcrm.org/news/news-releases/fda-confirms-investigation-novo-nordisk-ad-posited-60-minutes-story-about-weight (last visited Apr. 30, 2026)

[69] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Apr. 30, 2026)

[70] https://www.businesswire.com/news/home/20210525005492/en/Noom-Announces-540-Million-in-Growth-Funding-to-Further-Accelerate-Expansion-of-its-Digital-Health-Platform (last visited Apr. 30, 2026).

[71] https://twitter.com/novoholdings/status/1397170264702599171 (last accessed Apr. 30, 2026).

Noom.[72]

73. In September 2025, the FDA issued a Warning Letter citing misleading promotional claims for Victoza, Ozempic, and Wegovy in a national primetime TV special.[73]

74. In sum, Defendant promoted the safety, efficacy, and sale of Victoza in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

75. Novo Nordisk's comprehensive, immersive marketing has left no stone unturned in delivering their message that physicians and patients must use their drugs to treat obesity.

## III. Use of Victoza has been linked to the development of NAION

76. The Defendant knew or should have known of the risk of NAION with use of Victoza.

77. Defendant conducts clinical trials and has access to case reports and medical literature that provides them with superior knowledge compared to the general public as to the potential risks of their medications.

78. For example, in a clinical trial entitled "Non-Arteritic Anterior Ischemic Optic Neuropathy in an Otherwise Healthy Young Adult Patient Treated with Liraglutide and Semaglutide for Weight Loss: A Cautionary Tale" with results submitted in August 2051, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[74]

---

72 https://novoholdings.dk/investments/noom/ (last visited Apr. 30, 2026).
73 https://firstwordpharma.com/story/6093033 (last visited Apr. 30, 2026).
74 https://pmc.ncbi.nlm.nih.gov/articles/PMC12339668/ (last visited Apr. 30, 2026).

79. This study was to report a case of non-artertic ischemic option neuropathy (NAION) in an "otherwise healthy patient treated with Glucagon-Like Peptide-1 (GLP-1) receptor agonists (Ras) liraglutide and semaglutide."[75]

80. The study observed a 47-year-old female with a Body Mass Index of 27.92, and no known history of diabetes, hypertension, or ischemic heart disease, developed a progressive decline in "visual acuity in the right eye one month after initiating liraglutide therapy for weight loss."[76]

81. The study concluded that liraglutide "likely served as the initial trigger for NAION, with semaglutide acting as an additional contributing factor in the progression of the disease."[77]

82. A study posted by the JAMA Opthamology found a median of 3.3 years between GLP-1 RA use and the incidence of NAION.[78] An increased risk for NAION was seen in association with 2 GLP-1 Ras: hazard ratios, 1.39 for semaglutide and 1.25 for liraglutide.[79]

83. Another study found that patients with type 2 diabetes who are prescribed liraglutide have a 179% higher likelihood of developing NAION, while those prescribed insulin have an 86% greater likelihood compared to patients who were prescribed other diabetes medications.[80]

84. NAION is a medical condition involving damage to the optic nerve resulting in the loss of vision.

---

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] https://www.clinicaladvisor.com/news/glp-1-receptor-agonist-use-linked-to-nonarteritic-anterior-ischemic-optic-neuropathy/ (last visited Apr. 30, 2026).
[79] *Id.*
[80] https://www.epicresearch.org/articles/liraglutide-and-insulin-prescriptions-associated-with-increased-likelihood-of-rare-vision-loss (last visited Apr. 30, 2026).

85. It falls within the category of an eye stroke.

86. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

87. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. Ther swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[81]

88. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[82]

89. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[83]

90. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[84]

---

[81] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022, https://www.aao.org/eyenet/article/naion-diagnosis-and-management.

[82] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION).

[83] *Id.*

[84] *Id.*

91. Unfortunately, there is no effective treatment for NAION. Vision may worsen in the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[85]

92. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

93. Some NAION patients lose complete vision with no recovery in affected eye(s).

94. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes result in bumps and falls and injuries related to the unseen impacts and accidents.

95. In response, Novo Nordisk has acknowledged confirmed cases of NAION were identified within their clinical trials.[86]

96. Despite the growing number of articles, reports and an investigation by the PRAC of the Danish Medicines Agency, the Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Victoza.

## IV. Defendant's Continuing Failure to Disclose the Risk of NAION

97. According to an FDA safety announcement, the label for Victoza has been updated on at least forty-six (46) occasions since 2010, with the most recent update on October 14, 2025.[87]

---

[85] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022, https://www.aao.org/eyenet/article/naion-diagnosis-and-management.

[86] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Apr. 30, 2026).

[87] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2025/022341Orig1s046ltr.pdf (last visited Apr. 30, 2026).

Despite the fact there are at least forty-six (46) iterations of the Victoza label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Victoza to cause NAION and permanent vision loss as suffered by Plaintiff.

98. To date, the warning labels are still devoid of any mention of NAION.

99. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Victoza, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact as to not risk the potential for injury in the other eye.

100. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

101. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Victoza's labels without any prior FDA approval.

102. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

103. Recently, the Third Circuit reaffirmed that plain text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal

(FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

**PLAINTIFF-SPECIFIC FACTS**

104. In or around February 2023, Plaintiff was prescribed Victoza to treat her diabetes.

105. In or around November 2023, Plaintiff noticed changes in vision. She saw an ophthalmologist and was diagnosed with NAION.

106. Had Plaintiff been told her use of Victoza could cause her to develop NAION, she would have discontinued the medication right away. Instead, the package insert did not warn the medical community or patients of the risk of NAION.

107. On November 17, 2023, Plaintiff's ophthalmologist conducted a follow up regarding NAION and agreed with the decision to discontinue liraglutide "given recent reports suggesting its association with increased NAION rates" and noted that patient was told to discontinue Victoza.

108. A study linking GLP-1 receptor agonists (GLP-1 RAs), specifically semaglutide, to an increased risk of NAION was published online by *JAMA Ophthalmology* on July 3, 2024

109. A study linking GLP-1 receptor agonists (GLP-1 RAs), liraglutide & semaglutide, to an increased risk of NAION was published online by *Dovepress Taylor & Francis Group* on August 7, 2025.

110. As a result of Defendant's actions and inactions, Plaintiff suffers from severe vision loss and seeks damages associated with these injuries.

111. Defendant knew or should have known that use of liraglutide, Victoza, could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

112. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

113. Defendant's Victoza was at all times utilized and prescribed in a manner foreseeable to Defendant.

114. Plaintiff used Victoza, and did not misuse, or alter Victoza in an unforeseeable manner.

115. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and her physicians the true and significant risks associated with these medications.

116. As a result of Defendant's actions, Plaintiff and her physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in their Complaint and that those risks were the direct and proximate result of Defendant's conduct.

117. As a direct result of being prescribed and using Victoza, Plaintiff has been permanently and severely injured, having suffered serious consequences.

118. Plaintiff has and continues to suffer from oculus dexter (OD) and has had to implement radical changes to her lifestyle given her severe loss of sight.

119. As a direct and proximate result of her Victoza use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of ability to earn money and other economic losses including past and future medical expenses. Plaintiff diligently investigated the potential cause of these injuries, but their

relationship to Victoza was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

## COUNT I
## STRICT LIABILITY – FAILURE TO WARN

120. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

121. At all relevant times, Defendant engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Victoza, and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

122. The Victoza was expected to and did reach the usual consumers, handlers, and people coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

123. Defendant as the holder of the NDAs is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

124. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Victoza was inadequate.

125. The Victoza designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing

surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects including NAION, as well as other severe and permanent health consequences from Victoza, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Victoza.

126. Plaintiff did not have the same knowledge as Defendant and no adequate warning or other clinically relevant information, and data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

127. Defendant had a duty to provide adequate warnings and instructions for Victoza, to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

128. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Victoza, as it became or could have become available to Defendant.

129. Defendant breached their duty when they failed to provide an adequate warning of Victoza's potential risk to Plaintiff.

130. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs, Victoza, to health care providers empowered to prescribe and dispense Victoza to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of these medications, which resulted in permanent injuries to Plaintiff.

131. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Victoza created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

132. Despite the fact that Defendant knew or should have known that Victoza caused unreasonable and dangerous side effects, they continue to promote and market Victoza without providing adequate clinically relevant information.

133. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

134. The Victoza supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Victoza but despite their knowledge and information, Defendant failed and neglected to issue adequate warnings that Victoza causes serious and potentially irreversible vision issues, optic nerve damage and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Victoza undergo ophthalmological monitoring.

135. Defendant's failure to provide adequate warnings or instructions rendered Victoza unreasonably dangerous in that they failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

136. Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

137. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Victoza including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

138. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

139. Defendant continued to aggressively promote and sell Victoza, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

140. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Victoza and/or that there existed safer and/or equally effective alternative drug products that do not pose their same risk.

141. By failing to adequately test and research harms associated with Victoza and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Victoza and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Victoza. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Victoza and should or could be reported as an adverse event.

142. The liraglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Victoza, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote. This harm could have been prevented had Plaintiff been properly warned.

143. Victoza is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

144. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Victoza could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

145. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Victoza, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT II**
**NEGLIGENCE**

146. Plaintiff incorporate by reference all the forgoing language of their Complaint as if fully set forth herein and further states as follows.

147. Defendant had a duty to exercise reasonable care in the designing, developing, researching, testing, and manufacturing, selling, and distribution of Victoza.

148. Defendant knew or should have known that using Victoza created a significantly increased risk of NAION.

149. The negligence of the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Defendant designed and developed Victoza without thoroughly or adequately testing it;

b. Defendant failed to adequately and correctly warn the Plaintiff, the public, and the medical community, of the NAION risks associated with Victoza;

c. Defendant advertised and recommended the use of Victoza to treat diabetes without sufficient knowledge as to the significance of NAION risks;

d. Defendant failed to exercise reasonable care in designing Victoza in a manner which was dangerous to its users;

e. Defendant failed to exercise reasonable care when they collectively decided to conceal information concerning NAION risks;

150. Additionally, Defendant under-reported, underestimated and downplayed the serious dangers of Victoza association with NAION.

151. Defendant specifically failed to exercise reasonable care and breached their duty to Plaintiff when it failed to accompany Victoza with proper and/or accurate warnings regarding all adverse side effects—namely NAION—associated with the use of Victoza.

152. Despite the fact that Defendant knew or should have known that Victoza caused unreasonably dangerous side effects, like NAION, they made conscious decisions to downplay or ignore these risks and continue to market, manufacture, distribute, and/or sell Victoza to consumers without adequate warnings, including the Plaintiff.

153. Defendant knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

154. Defendants' negligence was the proximate cause of Plaintiff's NAION-related injuries, which Plaintiff suffered and/or will continue to suffer.

155. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects such as NAION, as well as other related severe and personal injuries which are permanent and lasting in nature, mental anguish, including diminished enjoyment of life, as well as the need for continued medical treatment and monitoring.

156. As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory and punitive damages, together with costs and interests, and any further relief as the Court deems proper.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**

157. Plaintiff incorporates by reference all the foregoing language of their Complaint as if fully set forth herein and further states as follows.

158. Defendant distributed, recommended, merchandized, advertised, promoted, and sold Victoza as treatment for diabetes.

159. At the time Defendant marketed, sold, and distributed Victoza for use by Plaintiff, Defendant knew of the use for which Victoza were intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

160. Plaintiff and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendant and used Victoza for its intended advertised use.

161. Plaintiff used Victoza for their intended purpose to treat her diabetes.

162. Victoza was not fit for their ordinary use of treating diabetes because they were defective due to them causing an increased risk of NAION.

163. As a direct cause of Victoza being not fit for their ordinary purpose of treating diabetes due to their association with NAION, Plaintiff was diagnosed with NAION after taking Victoza.

164. Within reasonable time after Plaintiff became aware that Victoza were associated with NAION, Defendant was provided notice of the breach.

165. Defendant herein breached the aforesaid implied warranties, as their drug Victoza were not fit for their intended purposes and uses.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory damages, together with costs and interest, and any further relief as the Court deems proper.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**

166. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

167. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Victoza, and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

168. Defendant as the holder of NDA is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

169. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Victoza was safe, effective, fit and proper for their intended use.

170. Victoza materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Victoza, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Victoza sold to Plaintiff.

171. Defendant expressly warranted that Victoza was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew

or should have known that Victoza was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

172. Victoza does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

173. Plaintiff and Plaintiff's physicians justifiably relied on Defendant's representations regarding the safety of Victoza, and Defendant's representations became part of the basis of the bargain.

174. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Victoza was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

175. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Victoza over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

176. Plaintiff purchased and used Victoza without knowing that the drug is not safe and well-tolerated, but that Victoza instead causes significant and irreparable vision loss and eye damage.

177. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Victoza, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously

existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT V**
**PUNITIVE DAMAGES**

178. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

179. The acts and omissions of Defendant described herein consisted of oppression and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendant's officers, directors, and/or managing agents.

180. Defendants' actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

181. Defendant misled both the medical community and the public, including Plaintiff and her physicians, by making false representations about the safety and effectiveness of Victoza and by failing to provide adequate instructions concerning its use.

182. Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Victoza despite available information demonstrating that drug could cause NAION and irreversible vision loss.

183. Defendant was or should have been in possession of evidence demonstrating that Victoza use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Victoza by providing false and misleading information regarding its safety and effectiveness.

184. Defendant failed to provide warnings that would have dissuaded health care

professionals from using Victoza, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Victoza.

185. As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to her use of Victoza.

186. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

187. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

188. Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

189. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

190. Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

191. Consequently, Defendant is liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendant as follows:

a. Awarding compensatory damages;

b. Awarding actual damages to the Plaintiff incidental to Plaintiff purchase and use of Victoza in an amount to be determined at trial;

c. Awarding punitive damages to the Plaintiff;

d. Awarding pre-judgment and post-judgment interest to the Plaintiff;

e. Awarding the costs and the expenses of their litigation to the Plaintiff;

f. Awarding reasonable attorneys' fees and costs to Plaintiff as provided by law; and

g. Granting all such other relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

RESPECTFULLY SUBMITTED

Ryan J. Duplechin
Wesley Chadwick Cook
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
P: 334.269.2343
Fax: 334.954.7555
Ryan.Duplechin@BeasleyAllen.com
Chad.Cook@BeasleyAllen.com

Date: September 3, 2026